IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| DONALD BRANCH, | χ | |
| | χ | |
| | χ | |
| Petitioner, | χ | |
| | χ | |
| vs. | χ | No. 05-1236-B/An |
| | χ | |
| GLEN TURNER, | χ | |
| | χ | |
| Respondent. | χ | |
| | χ | |

ORDER GRANTING LEAVE TO PROCEED IN FORMA PAUPERIS
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

Petitioner Donald Branch, Tennessee Department of Correction prisoner number 305293, an inmate at the Hardeman County Correctional Facility ("HCCF") in Whiteville, Tennessee, filed a pro se petition pursuant to 28 U.S.C. § 2254 in the Eastern Division of this district on August 22, 2005, along with an application to proceed in forma pauperis. On September 14, 2005, Chief Judge James D. Todd issued an order transferring the petition to this division pursuant to 28 U.S.C. § 2241(d).

Based on the information set forth in the petitioner's affidavit, the motion to proceed in forma pauperis is GRANTED. The Clerk shall record the respondent as HCCF warden Glen Turner.

I.   STATE COURT PROCEDURAL HISTORY

Following a jury trial in the Shelby County Criminal Court, Branch was convicted of two counts of aggravated vehicular homicide, a Class A felony, and one count of driving while license revoked, a Class B misdemeanor. He was sentenced on or about April 19, 1999 to consecutive terms of twenty-four (24) years and twenty-four (24) years, six months on the aggravated vehicular homicide counts and to six months on the charge of driving while license revoked, for an effective sentence of forty-nine (49) years imprisonment. On appeal, Branch's convictions were affirmed but the sentence for one count of aggravated vehicular homicide was reduced by six months, for a total effective sentence of forth-eight (48) years, six months imprisonment. State v. Branch, No. W1999-00506-CCA-R3-CD, 2002 WL 1558485 (Tenn. Crim. App. Jan. 4, 2002), perm. app. denied (Tenn. May 28, 2002).[1]

---

[1]     In his petition, Branch lists an additional charge of conviction. The Tennessee Court of Criminal Appeals explained this apparent discrepancy as follows:

> The defendant, Donald W. Branch, was indicted by the Shelby County Grand Jury for one count of driving while license revoked, one count of driving under the influence of an intoxicant ("DUI"), one count of reckless driving, two counts of vehicular homicide as the proximate result of the driver's intoxication, two counts of vehicular homicide as the proximate result of conduct creating a substantial risk of death or serious bodily injury, and two counts of aggravated vehicular homicide. In order to convict a defendant of aggravated vehicular homicide, the jury is required to make additional findings in a subsequent separate proceeding. Therefore, the State presented proof on each of the above counts, except those for aggravated vehicular homicide, during the initial jury trial. After Defendant was convicted of these offenses, a separate proceeding was held and Defendant was convicted of two counts of aggravated vehicular homicide also. Prior to sentencing, the trial court merged the DUI conviction with the convictions for vehicular
> (continued...)

2

Branch filed a pro se petition pursuant to the then-current version of the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222, in the Shelby County Criminal Court on July 19, 2002. Counsel was appointed to represent Branch and several amended petitions were filed. The postconviction court conducted an evidentiary hearing on September 25, 2003 and dismissed the petition on December 19, 2003. While the postconviction petition was on appeal, Branch sought and received permission to raise as an additional issue the impact of the decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), on his sentence. The Tennessee Court of Criminal Appeals affirmed the dismissal of the postconviction petition. Branch v. State, No. W2003-03042-CCA-R3-PC, 2004 WL 2996894 (Tenn. Crim. App. Dec. 21, 2004), perm. app. denied (Tenn. May 23, 2005).

The Tennessee Court of Criminal Appeals summarized the facts underlying the criminal charge as follows:

---

[1]     (...continued)
homicide by intoxication, and the conviction for reckless driving with the convictions for vehicular homicide by conduct creating a substantial risk of death or serious bodily injury. The latter vehicular homicide convictions were, in turn, also merged with the convictions for vehicular homicide by intoxication. Subsequent to Defendant's convictions for aggravated vehicular homicide, the trial court further merged the convictions for vehicular homicide by intoxication with these convictions, which resulted in convictions for three offenses: one count of driving while license revoked, Tenn. Code Ann. § 55-50-504, a Class B misdemeanor, and two counts of aggravated vehicular homicide, Tenn. Code Ann. § 39-13-218(a)(3), a Class A felony.

Id. at *1.

On May 30, 1997, Defendant's vehicle was involved in a collision with another vehicle, killing the driver of that vehicle and her six-month-old infant. The accident occurred at the intersection of Houston Levy and Canada Road with Highway 64, an intersection considered "dangerous" by those familiar with the area. Highway 64 runs in an east-west direction; Houston Levy lays south of Highway 64; and Canada Road is the name given Houston Levy as it continues north after crossing the highway. The entrance from Houston Levy and Canada Road onto Highway 64 was governed by stop signs at the time of the accident involving Defendant. A stop light was installed shortly thereafter. The speed limit governing traffic on the highway approaching the intersection was 55 miles per hour.

Prior to hitting the victims' vehicle, Defendant's vehicle was observed by at least five other motorists who were also traveling west on Highway 64 and who testified at Defendant's trial. One driver was Carolyn Blackburn. Between 5:30 and 6:00 p.m. on May 30, 1997, Blackburn was traveling west at approximately 58 to 60 miles per hour with her three daughters when she noticed Defendant's vehicle in her rear view mirror. He was "weaving in and out of the lanes, passing vehicles" and "coming up fairly fast" behind her. Highway 64 consisted of four lanes, with two lanes traveling in each direction. Since Blackburn was in the left lane when she observed Defendant, she quickly moved to the right-hand side of the highway. Blackburn testified that Defendant was driving a blue vehicle, traveling 30 to 40 miles per hour faster than she was, and nearly hit the bumper of her vehicle when he passed.

At approximately 5:30 p.m. that same day, Sam Wages was also driving west on Highway 64 when he noticed Defendant approaching "real fast" from behind him. He testified that Defendant's vehicle was moving "in and out of traffic." At that time, Wages was traveling in the left lane with another vehicle beside him on the right, so he was unable to move over. Wages alerted the other passengers in his vehicle to "hold on," because it appeared that Defendant might hit them. When Defendant caught up with the two vehicles, he passed them by driving in the left-turn lane. Wages estimated Defendant's speed to be approximately 80 miles per hour and testified that, based on the sound of the engine, Defendant was traveling as "fast as that vehicle would

run." Mary Kay Thompson, a passenger in Wages' vehicle, testified that Defendant followed them for approximately ten miles with an apparently "serious" desire to pass, but the traffic was too heavy at the time. She estimated his speed at 80 to 85 miles per hour when he passed them in the turn lane.

Jon Bliahu's vehicle was traveling on the right side of Sam Wages when Defendant passed them both in the left-turn lane. Bliahu was driving at approximately 65 miles per hour and estimated Defendant's speed to be 25 to 35 miles per hour faster than his (90-100 mph). Bliahu testified that Defendant was driving "erratically." Bliahu also observed Defendant spray gravel onto Wages' vehicle as he swerved from the left-turn lane back into the left lane of the highway.

Laura McEnaney also testified that Defendant passed her vehicle prior to colliding with the victims' vehicle. Contrary to the other drivers, McEnaney did not notice Defendant until his vehicle "flew past her" and swerved back into the lane in front of her. McEnaney testified that Defendant was driving "very fast," and she watched his vehicle weave in and out of traffic until it was out of sight. She estimated that Defendant was traveling at approximately 100 miles per hour.

While Defendant was traveling west on Highway 64 and approaching its intersection with Canada Road and Houston Levy, Stephanie Kuehl and her six-month child, Zadie, were approaching the same intersection from Houston Levy. Stephanie and Zadie were on their way to a wedding rehearsal dinner for her sister, who was to be married the following day. When Stephanie reached the stop sign at Highway 64, Carolyn Cansler, a realtor, was driving the vehicle behind her and began to check the highway for oncoming traffic. At trial, Cansler testified that only a few vehicles were east-bound (approaching from the left), and they were still a fair distance away. She observed no west-bound traffic (approaching from the right) and testified that the intersection had no bushes or trees to block her view—she could see clearly in both directions. As Cansler turned her head to check traffic from the left a second time, Stephanie's vehicle started across the highway to Canada Road. Cansler's head was still facing left when she heard the vehicles collide. It was so loud, Cansler thought something had exploded. When she turned back to the scene in front of her, the

5

victims' vehicle was airborne. She watched it land, passenger side down, in a ravine. Defendant's vehicle came to a stop, right side up, behind the victims. Defendant exited his vehicle, climbed up a nearby hill, and sat down with his head in his hands. Cansler dialed 911. When the police arrived, they assembled on the opposite side of the road. Because she was too frightened to cross the highway, Cansler drove home without giving a statement. She contacted the police a few days later.

At trial, Daniel Evans testified that he also observed the accident. Evans' vehicle was immediately adjacent to the victims' green Saturn, waiting to make a left turn from Houston Levy onto Highway 64, heading west. Evans observed a number of vehicles coming from the east as the victims' vehicle began to cross the highway. The blue vehicle driven by Defendant was among them and traveling "very fast." Defendant was even passing a vehicle as Evans watched him near the intersection. He became concerned for the occupants of the green Saturn and recalls uttering words similar to "Oh no, don't do that" as they continued across. Evans' wife heard his comments. She looked up just in time to see the blue vehicle approaching and testified that Defendant's vehicle appeared to accelerate as it neared the intersection. The Evans watched helplessly as the blue vehicle broadsided the green Saturn, "flipping it into a ditch on the side of the road." The blue vehicle had spun 180 degrees and came to rest facing east.

Richard Leggett was driving the vehicle that Evans had watched Defendant pass on his final approach to the intersection. Leggett was traveling west at approximately 55 miles per hour in the right lane of Highway 64 at that time because he planned to turn right onto Canada Road. According to his testimony at trial, Leggett was preparing to slow down for the turn when Defendant's blue Maxima passed him and swerved back into the lane in front of him. Leggett simultaneously observed the green Saturn belonging to the victims come to a rolling stop at Houston Levy and then proceed onto the highway. Defendant hit the passenger side of the Saturn so hard that the Saturn became airborne. Leggett estimated Defendant's speed was approximately 90 miles per hour as he drove by.

Shortly after the collision, the accident scene became congested with concerned motorists and emergency service personnel. Among the first to respond were

paramedics Jennifer Ridinger, Phillip Tolbert, and Amy
Laveck. Ridinger was initially assigned to Defendant and
noted that he was conscious, coherent, and had an
unusually strong odor of alcohol on his person. When
Tolbert began treatment a few minutes later, he asked
Defendant various questions in order to ascertain his
medical condition. Tolbert testified that Defendant
answered all of his questions, but very slowly. Tolbert
detected a strange smell emanating from Defendant which
he believed might be alcohol, and asked whether Defendant
had been drinking alcohol. Defendant replied negatively.
Laveck and Tolbert loaded Defendant into the ambulance
for transport to the Regional Medical Center at Memphis.
On the way, Laveck attempted to check Defendant's eyes
for pupil response, but Defendant would not open them.
Laveck confirmed that Defendant smelled strangely—like
alcohol or acetone—but could not identify the substance.

When Tolbert assumed the care of Defendant, Ridinger
was reassigned to look after the infant victim, Zadie.
Ridinger and her partner first immobilized her body on a
small spine board to prevent further injury and than
[sic] loaded her into an ambulance for transport to
LeBonheur Children's Medical Center. On the way, they
established the necessary IVs and administered oxygen to
keep her breathing. Zadie lapsed in and out of
consciousness during the trip. Her injuries included a
subdural hemotoma [sic] and subarachnoid hemorrhage,
which are accumulations of blood in membranes surrounding
the brain and spinal cord. Zadie was pronounced "brain
dead" on the day following the accident. Cause of death
was determined to be a severe head injury.

Danny Spry and Glenn Kneeland, emergency medical
technicians for the Shelby County Fire Department,
arrived at the accident scene and were immediately
advised that one of the victims, Stephanie Kuehl, was
trapped inside her vehicle. After failing in their
attempt to enter through the sunroof, the men used
cutters and spreaders to remove the door. When they
finally reached the victim she was bluish in color, not
breathing, and her pupils were fixed. Finding no pulse,
Spry and Kneeland sought confirmation of death from a
third paramedic and, thereafter, pronounced Stephanie
Kuehl deceased. At trial, Dr. O'Brien Cleary Smith
testified that Stephanie sustained the following injuries
from the impact: fractures of the skull, jaw, cervical
spine, pelvis, ribs, and collar bone; multiple abrasions

to head, face, and chest; crushed spinal cord; and the heart was torn from the aorta, as indicated by bleeding in the left chest cavity. Dr. Smith declared the cause of death to be multiple injuries and, from the position of Stephanie's feet, he was able to further ascertain that death had occurred suddenly. Her blood tests for carbon monoxide, alcohol, and drugs were negative.

When Joe D. Gurley, a patrolman with Shelby County Sheriff's Office, arrived at the accident scene, he discovered the victims' Green Saturn lying on its side in a ditch with massive damage and a blue Maxima sitting upright facing east. Because the Tennessee Highway Patrol ("THP") has jurisdiction over highway matters, Officer Gurley assisted by securing the scene and caring for the injured until an officer from the THP arrived. At 6:20 p.m., THP Trooper Cheryl McNeary showed up and observed that one victim, Stephanie Kuehl, was trapped in a Saturn; another victim, an infant, was being attended by nurses; and Defendant was lying on his back on a nearby hill. McNeary and the other troopers took measurements, examined the vehicles involved, and sent for an accident reconstructionist. After completing the preliminary investigation at the crash site, McNeary went to the Regional Medical Center to check on Defendant's condition.

Immediately upon his arrival at the Regional Medical Center, Defendant was taken to the shock-trauma unit and assigned numbers; specifically, patient number "591" and medical record number "9560178." According to the testimony of Kerry Stabe, a nurse in the shock-trauma unit, standard procedure at the Medical Center is to treat all emergency trauma patients as "unknowns" upon their arrival, giving them each a patient and medical number for purposes of identification and record keeping unless the patient is transferred from another hospital. At a later time, the records department will search previous records and compare patient data so that all information regarding a specific patient is located under a single number, usually the original. The "mechanism of injury" determines whether a new patient is admitted to the shock-trauma unit, and everyone admitted with a particular mechanism of injury receives the same treatment as each other patient within that category. A person with Defendant's mechanism of injury and/or circumstances (vehicle collision involving a fatality) would receive oxygen; two peripheral IVs; x-rays of the

8

chest, pelvis and spine; a CAT scan; a Tetanus shot; and lab tests, among other things. Lab tests include a blood chemistry profile and blood count. Kerry Lyons Stabe was working in the shock-trauma unit when Defendant was admitted and testified that he received these treatments and tests. Stabe also recalled asking Defendant questions concerning his medical history, including whether he had anything alcoholic to drink prior to the accident. Initially, Defendant told her that had not had anything alcoholic to drink. Because Stabe smelled alcohol on his person, she warned him to be honest with her because intoxicants might interfere with the medications received during treatment. Thereafter, Defendant admitted drinking "two beers."

Dr. Martin Croce, the Associate Director of the Trauma Unit, also testified regarding admission to the trauma center. He stated that when a patient's injury is the result of some sort of violent act, vehicle wreck, shooting, stabbing, fall, et cetera, the injured person is admitted to the shock-trauma unit. Located at the other end of the hall is the "emergency room," which treats nontraumatic emergency conditions, such as chest pain and diabetes. One laboratory, which is located on the same floor as the emergency room and trauma facility, performs whatever tests are necessary to treat the patients in these departments. Tests related to patients in other departments are sent to a lab located elsewhere in the Medical Center. Typically, when a patient arrives at the shock-trauma room, a team of resident doctors are standing by and each performs a specific function. The entire procedure is overseen by a chief resident, who was Dr. Croce in Defendant's case. When asked whether the Medical Center requires emergency personnel to document all procedures, Dr. Croce responded negatively. He testified that "in a perfect world all that would be done." However, in a trauma unit, documenting every step is simply not practical. Dr. Croce noted that Defendant's medical report form did not contain the name of the nurse or doctor who drew his blood.

Regarding blood test procedures for trauma patients, Dr. Croce testified that, typically, the physician will draw the blood and hand it to the nurse. The nurse then disperses the sample into the appropriate tubes for the various analyses. Next, the person who prepared the tubes places them together in one bag and takes the bag around the corner to the lab. Each tube is affixed with a

sticker containing the individual patient's numbers and other information in the form of a sticker. The stickers are removed from a blue card which was attached to the patient when he or she was admitted to the trauma unit.

Once the sample arrives at the lab, the medical assistant logs the name and numbers into the computer, prepares the specimen for the specific tests required, and delivers the specimen to a medical technologist to conduct the test. Every specimen is accompanied by a request slip which also contains the patient's medical number. This number is checked against the computer identification number on the sample and the test results. The medical lab assistant who logged in Defendant's sample initialed the entry, "D.A.Y[.]," which indicated that the work was done by Deborah Yates, a medical assistant employed by the laboratory. At trial, Yates testified that she matched the specimen number with the lab request and Defendant's patient number. Yates also identified her initials on Defendant's lab test report and the initials of the technician who ran the lactate and blood alcohol tests. The initials were "D.G.M.," which stands for Dowana Moore.

Dowana Moore confirmed that she worked at the Medical Center and was the medical technician who performed Defendant's blood alcohol test. Moore further testified that specimens from the shock-trauma unit are handled differently than those from other departments. When a shock-trauma patient is on his or her way to the Medical Center, the laboratory personnel are notified in advance and put all other work aside, giving their work for the shock-trauma unit top priority. When conducting blood alcohol tests, Moore testified that standard procedure requires the technician to first run a control group to ensure the machine is operating properly. The laboratory uses a CX7 Beckman instrument, which tests blood serum as opposed to whole blood samples. Moore testified that the machine automatically converts the serum result to a whole blood value. Once the controls are run, the technician inserts the tube containing the blood specimen into the instrument and it sends the results to the lab computer's printer. Once again, the patient's test identification numbers are matched against the patient's unknown or medical numbers. Defendant's blood alcohol level was determined to be 0.22.

Dr. Stafford, Professor of Pathology and Director of the Forensic Laboratory at the University of Tennessee at Memphis, was called to testify regarding the scientific method by which blood alcohol content is determined with the CX7 Beckman instrument. To this end, Dr. Stafford testified that, basically, the process is based on enzymatic conversion of alcohol to another chemical compound which absorbs a specific known quantity of light. Dr. Stafford confirmed that the process is widely accepted by the scientific community and also commonly used. Dr. Stafford also confirmed that the CX7 Beckman instrument tests blood serum and that the alcohol content in blood serum is typically higher that in that of whole blood by as much as 14 percent. However, the number entered into the medical charts is the value for grams of alcohol per one hundred milliliters of whole blood. Dr. Stafford admitted that he was unsure whether the instrument had the capability to convert a reading for serum blood to a whole blood result or if it was necessary to make the calculation afterward. In the event that the machine is not designed to report the value in whole blood, the mathematical conversion from a serum blood reading to whole blood is simple, requiring the operator to merely divide the serum blood result by 1.14.

Dr. Stafford further testified that, based on his training and experience, a person with a blood alcohol content ("BAC") of 0.22 would be severely impaired in various ways, including a "terribly" prolonged reaction time which might be five or six times that of normal. In addition, the intoxicated person would also experience impaired judgment in two aspects, decision-making skills and orientation with the physical world (e.g., judgment regarding speed, distance, and space); and impaired motor functions, which affects muscle control and hand/eye coordination. Generally, the abilities an intoxicated person first loses are those that he or she has learned—anything which requires mental information processing. Loss of muscle control follows, and vital functions are the last to be appreciably affected. This includes respiration, heartbeat, and so forth. When asked whether alcohol affects the probability that the alcohol-impaired person may become involved in an accident, Dr. Stafford responded that studies show the chances that a person with a BAC of 0.10 will become involved in a multi-vehicle accident are five times greater than that of a person without alcohol in his or her system. With a BAC of 0.15, the chances increase to

11

approximately twenty-eight times that of normal. Dr. Stafford was unwilling to comment regarding the accident statistics for a person with a BAC of 0.22 because the data for a level that high was insufficient. Dr. Stafford also testified that some people appear still able to function at extremely high levels of alcohol intoxication. For example, a person may be able to drive and remain on the roadway for miles without running into something. The ability to appear normal depends on how familiar the person is with his or her surroundings and how familiar the subject is with high BAC levels.

At approximately 8:00 p.m., Trooper McNeary arrived at the Medical Center to see Defendant and was directed to the trauma unit where she discovered Defendant lying on his back. McNeary noted a strong odor of alcohol coming from Defendant's person and that his speech was "slurred" and "mush-mouthed." In her opinion, Defendant was under the influence of some type of intoxicant, probably alcohol. McNeary summoned an officer from the DUI Unit.

Tommy Woods, with the Memphis Police Department DUI Unit, was summoned by the THP to offer a blood alcohol test to Defendant. When Woods arrived at the Medical Center, he advised Defendant on his rights under Miranda, and his consensual rights concerning the blood test. Defendant refused the test. In Woods' opinion, Defendant showed "obvious" signs of alcohol intoxication: he smelled strongly of alcohol, his speech was slurred or "thick-tongued," and he was unable to keep his eyes open.

Robin Beach, an Accident Reconstructionist employed by the Michigan State Police, was contacted by the Shelby County Prosecutor's Office to assist them in evaluating physical evidence from the scene. Beach took measurements and photographs of the collision site, prepared a scaled diagram of the scene, and created a computer animation of the accident. At trial, Beach reported the following findings and conclusions: Defendant's vehicle was traveling a minimum speed of 76 miles per hour (112 feet/second) upon impact with the victims' vehicle; the victims were traveling at approximately 17 miles per hour at impact; no pre-impact skid marks were created by Defendant's vehicle; the intersection is visible from at least 760 feet when traveling westward; if Defendant's vehicle had been traveling at 70 miles per hour, it would have missed impacting the victims' vehicle by 57 feet; if

Defendant had begun to apply brakes at the point when the
intersection was visible, it would have taken 4.67
seconds to stop; and the angle of impact with the
victims' vehicle was 107 degrees (in other words,
Defendant's vehicle was turning slightly to the right on
impact). Beach also reported the margin of error
regarding speed calculations was 5 miles per hour. The
prosecutor's office issued a similar request for
assistance to Dr. Martin Lipinski, Professor of Civil
Engineering at the University of Tennessee. At trial, Dr.
Lipinski confirmed that Defendant's speed was
approximately 80 miles per hour at the time of impact,
and the victims were traveling at approximately 17 miles
per hour.

According to Joe Knipper, an employee with the
Tennessee Department of Safety who was called to testify
at trial, Defendant was driving with a "revoked" license
on May 30, 1997.

Defendant visited with five former coworkers between
the hours of 12:00 and 1:30 p.m. on May 30, 1997, and all
five testified at trial that Defendant was not
intoxicated at that time. Defendant's girlfriend, Tolanda
Morrow, also testified that Defendant came to her home at
4:00 p.m. that day, that he was not intoxicated, and that
he did not drink anything while he was there. Defendant
left Morrow's house at approximately 5:00 p.m., and she
received a telephone call informing her of the accident
15 to 20 minutes later. Upon her arrival at the scene of
the collision, Morrow spoke with Officer Gurley. During
their conversation, she informed him that she had no
knowledge whether Defendant had any alcohol to drink
prior to the accident.

On May 30, 1997, Shondra Todd worked at the Amoco
Store located 2.9 miles from the collision site on
Highway 64. Defendant patronized the store almost every
day, according to Ms. Todd. She testified at trial that
between 5:00 and 5:30 on the day of the accident,
Defendant came to the Amoco and purchased a fruit punch.
The store also sells alcoholic beverages, but Defendant
did not purchase any. Ms. Todd claimed that Defendant's
behavior was not out of the ordinary. He did not stagger
or smell of alcohol. Before Defendant left, he also spoke
with Todd's husband, Ed, who was waiting for Shondra in
the parking lot outside the store. At trial, Ed Todd
testified that he noticed nothing unusual about

13

Defendant's behavior that day—he did not slur his speech or smell of alcohol. Defendant left the Amoco at approximately 5:30 p.m.

Defendant did not testify during the first phase of his trial, after which the jury found him guilty of one count of driving while license revoked, one count of driving under the influence of an intoxicant ("DUI"), one count of reckless driving, two counts of vehicular homicide resulting from intoxication, and two counts of vehicular homicide resulting from conduct creating a substantial risk of death or serious bodily injury. During the second phase, the jury was required to further determine whether Defendant was guilty of aggravated vehicular homicide under Tennessee Code Annotated section 39-13-218. Conviction for this offense required the State to prove that Defendant had two or more prior DUI convictions, or one prior DUI conviction and 0.20 of one percent or more of alcohol in his blood at the time of the offense. To this end, the State presented testimony from Jimmy German, the Circuit Court Clerk of Fayette County, who confirmed that Defendant had two prior DUI convictions: one conviction occurred on June 18, 1996, in Shelby County and the other occurred six months later, on December 2, 1996, in Fayette County. German also testified that Defendant's second DUI was committed while on probation and with a revoked license from the Shelby County conviction. However, the crime was reduced to DUI, first offense, when Defendant pled guilty pursuant to a negotiated plea agreement. During the second phase of trial, Defendant testified and admitted to both DUI convictions. At the conclusion of the second proceeding, the jury convicted Defendant of two counts of aggravated vehicular homicide; both verdicts were based on the jury finding that Defendant had one prior DUI conviction, other than the conviction returned for the case on trial, and that Defendant was driving with a blood alcohol content of 0.20 of one percent or more at the time of the offense.

. . . .

At the sentencing hearing, Antonio Perry, the manager of the records department for Shelby County Division of Corrections, testified that Defendant had been sentenced to serve five weekends for a previous probation violation. May 30, 1997 would have been the final weekend in his sentence. Perry also testified that

14

defendants whose driving privileges had been suspended or revoked were prohibited from driving to the facility.

Defendant testified at the sentencing hearing and professed remorse for killing the victims. He also claimed to have respect for human life and for the law. Although he was aware that he should not have been driving on May 30, 1997 with a revoked license, he stated that he did not intend to hurt anyone and asked the Kuehl family to forgive him. Defendant denied that he had a problem with alcohol and claimed to drink only socially, e.g., at parties, clubs, and with his friends when they play sports. Defendant admitted that he pled guilty to his June 1996 DUI charge and that he spent two days in jail. He was then placed on probation for one year, his license was revoked, and he was required to attend a class on alcohol where he "learned that driving under the influence can kill." He further acknowledged that six months later, in Fayette County, he was arrested again on DUI charges after he lost control of his vehicle and drove off the road, landing upside down in a ditch. Defendant's girlfriend had been playing with her brakes, "teasing" him, as he followed her on a narrow country road. She did not realize how closely Defendant was following her and, ultimately, he was forced to drive into a ditch to avoid hitting her vehicle. His blood alcohol content was 0.15 at the time of that offense.

During cross-examination, Defendant admitted to purchasing a vehicle in April 1997 while his license was revoked and, in the months following (while his license was still revoked), he drove the vehicle to work and back, on shopping trips and errands, to his girlfriend's house, and to visit with friends. To comply with his weekend sentences at the penal farm, however, he obtained rides from other people.

Defendant further testified that on the day of the accident, he left work at 12:00 noon and drove to Arlington, Tennessee to see friends and former coworkers. A few hours later, he drove to his girlfriend's house, where he remained for approximately one hour before he had to leave for his last weekend at the penal farm. His girlfriend usually gave him a ride to the facility, but on May 30 she was too tired. As a result, Defendant drove himself. He left his girlfriend's house between 5:00 and 5:15 p.m.

Defendant testified that he drove approximately 60 or 65 miles per hour in his attempt to reach the penal farm and acknowledged that this was roughly 10 miles over the posted speed limit. He recalled the traffic was heavy that day and, therefore, he was particularly cautious while driving. He claimed to pay close attention to his surroundings during the trip, taking special care as he drew near the "dangerous" intersection at Houston Levy and Canada Road. He noticed a green vehicle approaching the intersection and recalled moving into the right lane, but conceded that he did not slow down. At this point, his attention was drawn to the new "Citgo" store under construction. Defendant testified that he spent a few moments musing about when the store would open. By the time his gaze returned to the road, the green vehicle was directly in front of him. Defendant testified that he did not drink any alcohol on May 30, 1997 and denied stating to Nurse Woods that he drank "two beers" earlier that same day. According to Defendant, the results of the blood alcohol test must be a mistake.

At the conclusion of the sentencing hearing, the trial court found the following enhancement factors applied: (1) the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (4) a victim of the offense was particularly vulnerable because of age; (8) the defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (10) the defendant had no hesitation about committing a crime when the risk to human life was high; and (16) the crime was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(1), (4), (8), (10), and (16) (1997). The trial court assigned great weight to factor (1), based on Defendant's second prior DUI conviction and the fact that he admitted to driving during a substantial period of his probation with a revoked license. Factor (4) was found applicable to only the count of aggravated vehicular homicide concerning the infant victim, Zadie, due to her vulnerability because of age, and factor (8) was given great weight based on the proof that Defendant had "continually and repeatedly violated conditions of release" into the community. The court also gave factor (10) great weight based on the steady stream of witnesses who offered proof that Defendant endangered their lives while driving intoxicated at a great rate of speed on

Highway 64, but found that factor (16), applicable when the potential for bodily injury was great, was entitled to very little weight because the state of the law was "in flux" regarding whether this factor is appropriate to apply based on risk to persons other than the victims. After further concluding that no mitigating factors applied in Defendant's case, the trial court sentenced Defendant to serve twenty-four years for the count of aggravated vehicular homicide involving Stephanie Kuehl, twenty-four years and six months for the offense involving Zadie Kuehl, and six months for driving while license revoked.

With regard to consecutive sentencing, the trial court found Defendant a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." In making this determination, the trial court noted that Defendant had multiple DUI convictions and probation violations and that he was unable to comply with court orders prohibiting him from driving. The trial court observed that Defendant admitted to driving frequently while his license was revoked and for reasons the trial court considered "silly" or dangerous. Specifically, the trial court cited the circumstance where Defendant and his girlfriend played "dodgem vehicles" on the highway while his blood alcohol content was 0.15. The trial court found Defendant's driving at an excessive speed in an extremely intoxicated state on a busy highway evinced behavior that was "bold" and "evil," indicating "utter contempt for the laws of society [and] for the safety of the people on the highway." Accordingly, because Defendant was "out of control and endangered the entire community," the court found him a dangerous offender whose sentences should be served consecutively. The trial court also concluded that Defendant's sentence of forty-nine years reasonably related to the severity of his offenses, noting that Mr. Kuehl had lost his wife and all of his children (Stephanie Kuehl was twelve weeks pregnant at the time she was killed), and stated that the length of the sentence imposed was necessary for the safety of the public.

State v. Branch, 2002 WL 1558485, at *2-*10.

In this federal habeas petition, Branch raises the following issues:[2]

1.  Whether he was denied his right to the effective assistance of counsel in violation of the due process clause of the Fourteenth Amendment to the United States Constitution, the Sixth Amendment to the United States Constitution, and Article I, section 9 of the Constitution of the State of Tennessee;

2.  Whether the trial judge was so biased and prejudiced toward him that he was denied his constitutional rights to a fair trial and therefore the trial judge should have recused himself;

3.  Whether the indictment and/or indictments were void because they failed to allege the requisite mental state of "knowingly" as required by Tenn. Code Ann. § 39-17-417(c);

4.  Whether his sentence is in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution;

5.  Whether Blakely v. Washington should retroactively apply to this case under the Teague v. Lane test;

6.  Whether Tennessee should be bound by the test announced in Teague v. Lane when applying a new federal announcement to its own state collateral proceedings;

---

[2]  Attached to the form petition are two additional documents, entitled "Petition for Writ of Habeas Corpus" and "Brief in Support of Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254." The first attachment, the "Petition," contains a listing of issues that overlaps with, but is not identical to, that set forth in the form petition. The second attachment, the "Brief," contains lists of the issues raised on direct appeal and in the postconviction petition that are far more extensive than the issues raised in the form petition. The petitioner does not explicitly indicate, however, either in his form petition or his supplemental "Petition" or "Brief," that he desires to raise in his federal habeas petition each of the issues he contends was litigated in state court. Nonetheless, in order to avoid overlooking any issue this petitioner desires to raise, the listing that follows in the text includes every issue raised in the form petition, in the supplemental "Petition," and in the "Brief."

18

7.    Whether the evidence with regard to vehicular homicide and aggravated vehicular homicide is sufficient to support the verdicts beyond a reasonable doubt;

8.    Whether the instructions given to the jury on "proximate results" were insufficient to allow the jury to determine if his conduct or intoxication was the proximate cause of the deaths;

9.    Whether the trial judge erred in allowing the blood test results into evidence as the State failed to establish the "chain of custody" of the blood sample that was tested or otherwise establish the identity and integrity of the sample;

10.   Whether the trial judge erred in refusing to allow the defense an opportunity to rebut the final closing argument of the prosecution when the State made only a perfunctory opening argument;

11.   Whether the sentence imposed by the trial judge was excessive as the trial judge misapplied the enhancement factors; and

12.   Whether the trial judge erred in ordering consecutive sentencing as the trial judge misapplied the applicable criteria required by the Wilkerson case.

III. ANALYSIS

A.    Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

      (A)  the applicant has exhausted the remedies available in the courts of the State;  or

      (B)  (i)  there is an absence of available State corrective process;  or

19

> > (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. E.g., <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509, 519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. <u>Picard v. Connor</u>, 404 U.S. 270, 275-76 (1971); <u>Rust v. Zent</u>, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" <u>Id.</u> at 163 (quoting <u>Picard</u>, 404 U.S. at 278). A habeas petitioner does not

satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id.

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Id. When a petitioner raises different factual issues under the same legal theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Moreover, the state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, the state-court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332 (1978) (per curiam); see also Baldwin v. Reese, 124 S. Ct. 1347, 1350-51 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Coleman, 501 U.S. at 752-53; Teague v. Lane, 489 U.S. 288, 297-99 (1989); Wainwright v. Sykes, 433 U.S. at 87-88; Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. Teague, 489 U.S. at 297-99; Wainwright v. Sykes, 433 U.S. at 87-88. Cause for

22

a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

The conduct of Branch's postconviction proceedings was governed by the then-current version of Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222. That act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governed the filing of petitions. <u>Id.</u> at § 40-30-202. The statute also enunciated a standard by which state courts were to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine

the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

Id. at § 40-30-206(f).[3]

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. Hannah v. Conley, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing first statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). In this case, the prisoner's right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

_____

[3]   Tenn. Code Ann. § 40-30-206 continued:

(g)   A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1)   The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2)   The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)   A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

B.    <u>Legal Standard for Merits Review</u>

The standard for reviewing a habeas petitioner's constitutional claims on the merits is enunciated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also determine whether the state court decision with respect to each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

1.    § 2254(d)(1)

The Supreme Court has issued a series of decisions
setting forth the standards for applying § 2254(d)(1).[4] In (Terry)
Williams v. Taylor, 529 U.S. 362, 404 (2000), the Supreme Court
emphasized that the "contrary to" and "unreasonable application of"
clauses should be accorded independent meaning. A state-court
decision may be found to violate the "contrary to" clause under two
circumstances:

> A state-court decision will certainly be contrary to our
> clearly established precedent if the state court applies
> a rule that contradicts the governing law set forth in
> our cases. . . . A state-court decision will also be
> contrary to this Court's clearly established precedent if
> the state court confronts a set of facts that are
> materially indistinguishable from a decision of this
> Court and nevertheless arrives at a result different from
> our precedent. Accordingly, in either of these two
> scenarios, a federal court will be unconstrained by §
> 2254(d)(1) because the state-court decision falls within
> that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538
U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003);
Bell v. Cone, 535 U.S. 685, 694 (2002).[5] The Supreme Court has
emphasized the narrow scope of the "contrary to" clause, explaining
that "a run-of-the-mill state-court decision applying the correct
legal rule from our cases to the facts of a prisoner's case would

---

[4]    By contrast, there is a dearth of caselaw concerning the standards
for applying § 2254(d)(2).

[5]    The Supreme Court has emphasized that this standard "does not require
citation of our cases—indeed, it does not even require awareness of our cases,
so long as neither the reasoning nor the result of the state-court decision
contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis
in original).

26

not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406; <u>see also</u> <u>id.</u> at 407 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

A federal court may grant the writ under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." <u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75; <u>Williams</u>, 529 U.S. at 409.[6] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[7] "[A] federal habeas court

_____

[6] Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 408. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. <u>See</u> <u>Williams v. Coyle</u>, 260 F.3d 684, 699-700 (6th Cir. 2001), <u>cert. denied</u>, 536 U.S. 947 (2002).

[7] <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same. The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being (continued...)

making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.[8]

Moreover, § 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." Harris v. Stovall, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It was error for the district court to rely on authority other than

---

[7]   (...continued)
analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly."); Williams, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

[8]   See also Brown v. Payton, 125 S. Ct. 1432, 1442 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

28

that of the Supreme Court of the United States in its analysis under § 2254(d).") Finally, in determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

   2. § 2254(d)(2)

   There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The few decisions interpreting this provision have attempted to incorporate the standards applicable to the "unreasonable application" prong of § 2254(d)(1). Thus, the Sixth Circuit stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

<u>Young v. Hofbauer</u>, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002) (citing 28 U.S.C. § 2254(e)(1));[9] <u>see also</u> <u>Stanley v. Lazaroff</u>, 01-4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); <u>Jackson v. Holland</u>, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21, 2003) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in <u>Williams</u>, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing <u>Torres v. Prunty</u>, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

IV.   <u>ANALYSIS OF PETITIONER'S CLAIMS</u>

A.   <u>Ineffective assistance of counsel (Claim 1)</u>

In his first claim for relief, Branch contends that he received ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments.[10] The factual basis for this claim is not completely clear. In the form petition, Branch asserts that he "was denied his right to effective assistance of counsel on information and belief that defense counsel may not have investigated the facts of the case and interviewed certain

---

[9]   <u>See also</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

[10]   Although the petition also cites the Tennessee Constitution, this Court is authorized to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Thus, any claim based on the Tennessee Constitution is not cognizable in federal court.

potential witnesses on behalf of the petitioner."[11] Branch raised this issue in his postconviction petition, Petition for Post Conviction Relief, filed July 19, 2002, at ¶ 14, but he did not pursue the issue on appeal to the Tennessee Court of Criminal Appeals, see Brief of Appellant, Branch v. State, No. W2003-03042-CCA-R3-PC, dated June 4, 2004.[12] Accordingly, as Branch did not fully and fairly present this claim to the state courts, and as no further avenues exist for exhausting this claim, this aspect of the ineffective assistance claim is barred by procedural default.

In his "Petition," which is attached to the form petition, Branch further asserts that "trial counsel Mozella Ross said she would get his case down to Reckless Homicide a Class D felony" (¶ 12), that "he was not apprised of the elements of the offense for which he was charge[d]" (¶ 13), that "trial counsels never informed him of the elements of the offense of vehicular homicide and aggravated vehicular homicide (id.), and that "he could not, therefore[,] understand the nature of the offenses to

---

[11]     The petition does not describe the facts defense counsel could have discovered or identify the witnesses who should have been interviewed, and the petition also makes no argument that, if only counsel had undertaken a more thorough investigation, there is a reasonable probability the result of the prisoner's trial would have been different.

[12]     See also Branch v. State, 2004 WL 2996894, at *3 ("In both his pro se and amended petitions, the petitioner alleged numerous instances of ineffective assistance of counsel. However, on appeal to this court he confines himself to arguing that trial and appellate counsel were ineffective for not citing reported criminal law cases when arguing for the instruction on proximate causation; appellate counsel was ineffective for not supplementing his appellate brief with State v. Farmer, 66 S.W.3d 188 (Tenn. 2001), which was released during th pendency of the appeal; and appellate counsel was ineffective for not raising the issue of the trial judge's failure to recuse himself on direct appeal.").

which he was being convicted because of his diminished mental
capacity (¶ 13). Although Branch raised this issue in his pro se
postconviction petition, Petition for Post Conviction Relief, filed
July 19, 2002, at ¶¶ 11-12, he did not pursue the issue on appeal
to the Tennessee Court of Criminal Appeals, see Brief of Appellant,
Branch v. State, No. W2003-03042-CCA-R3-PC, dated June 4, 2004; see
also Branch v. State, 2004 WL 2996894, at *3.[13] Accordingly, as
Branch did not fully and fairly present this claim to the state
courts, and as no further avenues exist for exhausting this claim,
this aspect of the ineffective assistance claim is barred by
procedural default.[14]

        In his "Brief," which is attached to the form petition,
Branch asserts only that, in his postconviction proceeding, he
raised an issue that he was denied the effective assistance of
counsel, but does not elaborate on the factual basis for the claim
except to refer to the stack of documents submitted with his
filing. It appears that Branch intends to raise the three issues he

_____

[13]    Although Branch did not raise this issue in his brief to the
Tennessee Court of Criminal Appeals, the state court, in its recitation of the
testimony of the witnesses at the postconviction hearing, briefly addressed
Branch's testimony that his attorneys did not adequately explain the nature of
the charges to him. Branch v. State, 2004 WL 2996894, at *4. In light of the
explicit statement of the Tennessee Court of Criminal Appeals as to the claims
that were properly raised on appeal, id. at *3, this recitation of the facts does
not establish that Branch exhausted this claim in state court. Baldwin v. Reese,
124 S. Ct. at 1350-51.

[14]    Moreover, Branch has not explained the significance of counsel's
alleged omissions. He did not enter a guilty plea in this case, and he has not
explained how, if only he knew then what he knows now about the charges against
him, the result of his trial would likely have been different.

exhausted in state court in connection with his postconviction petition. See supra p. 31 n.12.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the
presumption that, under the circumstances, the challenged
action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320,
342 (6th Cir. 1998) ("The specifics of what Coe claims an effective
lawyer would have done for him are too voluminous to detail here.
They also largely miss the point: just as (or more) important as
what the lawyer missed is what he did not miss. That is, we focus
on the adequacy or inadequacy of counsel's actual performance, not
counsel's (hindsight) potential for improvement."); Adams v. Jago,
703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been
denied effective assistance by erroneous tactical decisions if, at
the time, the decisions would have seemed reasonable to the
competent trial attorney'").

       A prisoner attacking his conviction bears the burden of
establishing that he suffered some prejudice from his attorney's
ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th
Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir.
1992). "[A] court need not determine whether counsel's performance
was deficient before examining the prejudice suffered by the
defendant." Strickland, 466 U.S. at 697. If a reviewing court finds
a lack of prejudice, it need not determine whether, in fact,
counsel's performance was deficient. See id. at 697.

       Branch exhausted a claim that trial and appellate counsel
were ineffective for not citing reported criminal law cases when

34

arguing for the instruction on proximate causation on direct appeal. See supra p. 31 n.12.[15] The Tennessee Court of Appeals denied this claim on the merits, explaining as follows:

> Appellate counsel agreed that the jury instruction on proximate causation was one of the key issues at trial and on appeal. He acknowledged he cited civil cases in his appellate brief in support of his argument on that issue, and he did not cite the reported criminal cases of Letner v. State, 156 Tenn. 68, 299 S.W. 1049 (Tenn. 1927); Copeland v. State, 154 Tenn. 7, 285 S.W. 565 (Tenn. 1926); State v. Grose, 982 S.W.2d 349 (Tenn. Crim. App. 1997); or State v. Ruane, 912 S.W.2d 766 (Tenn. Crim. App. 1995). However, he did not think that those cases, all of which he had read "at one time or another," were on point, as they addressed the concept of superceding and intervening causes in general homicide cases and not the specific issue of whether proximate cause was the appropriate test to be applied in a vehicular homicide case. . . .

> Junior trial counsel testified he had been licensed for seven years, had participated in over twenty criminal trials, and had handled "thousands" of criminal cases during his years with the public defender's office and in his current private practice, which consisted of approximately 95% criminal defense work. He said he and senior trial counsel did not believe the pattern jury instruction on proximate result adequately defined "proximate result versus proximate cause" and, for that reason, had argued at length for an instruction that "tend[ed] more towards the civil standard." Junior trial counsel testified he thoroughly researched the issue, but

_____

[15]     Under Tennessee law, "vehicular homicide" is defined, in relevant part, as "the reckless killing of another by the operation of an automobile, airplane, motorboat, or other motor vehicle: (1) [a]s the proximate result of conduct creating the risk of death or serious bodily injury to a person; or (2) [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213 (1997). On direct appeal, Branch argued that the trial court's jury instructions failed to properly define the term "proximate result." Branch v. State, 2002 WL 1558485, at *15-*16. In rejecting that argument, the Tennessee Court of Criminal Appeals observed, in conclusion, that "we observe that the legal authority cited in Defendant's brief to support his argument fails to contain an opinion from this Court on this specific issue. In fact, the majority of the opinions cited by Defendant concern civil matters. Defendant is not entitled to relief on this issue." Id. at *16. (The substance of this issue will be addressed infra.)

was simply unable to find much case law in support of their argument:

> What I can recall is that from the beginning on this case, I'm pretty sure there wasn't a lot of authority on Aggravated Vehicular Homicide and very little as to this issue on Vehicular Homicide, the more—frankly more common crime in Tennessee. There was some speculation about whether this was the first Aggravated Vehicular Homicide case in Tennessee that went to trial after they passed that statute. We spoke with—I know that we conferred with [appellate counsel] from the beginning about how the case law works on this, had done some research and didn't find anything that was clearly on point for this crime and that issue.
>
> And as to those cases, I don't believe those were all even Vehicular Homicide cases that you cited. But I'm not familiar with them word by word. I'm not going to pretend that I am. But I know that we looked at that issue extensively and tried to find something clearly on point and did not.

Although junior trial counsel was unsure how many hours he spent researching the specific issue of proximate cause, he testified that the total time he spent on the case, which he recorded on the file jacket, eventually covered six, full legal-sized pages. . . .

Senior trial counsel testified she was admitted to the bar in 1991 and had tried "probably at least 100" cases, with 20 to 25 before a jury, during the eight years she had worked in the Public Defender's Office. Junior trial counsel researched the proximate cause issue, and they discussed it with appellate counsel. They could not find any cases on point and, therefore, believed their case was one of first impression, presenting issues that had not been litigated before. . . .

    . . . .

The petitioner argues that both trial and appellate counsel were ineffective for failing to cite reported criminal law cases when arguing for a jury instruction on proximate cause. He contends that by focusing on the "proximate result" language of the vehicular homicide

36

statute, counsel "missed the larger, more overriding issue of causation and its role in general homicide cases." According to the petitioner, had counsel cited to the "wealth of reported [criminal] cases" that discuss proximate and intervening cause in the context of a homicide case, the trial court "would have had tangible, controlling case-law to rely on in giving a more thorough proximate cause instruction." In support, he notes this court's observation in the direct appeal opinion that "the legal authority cited in Defendant's brief to support his argument fails to contain an opinion from this Court on this specific issue" and that "the majority of the opinions cited by Defendant concern civil matters," Donald W. Branch, 2002 WL 1558485, at *16, as well as the trial court's statement to defense counsel that it would issue the proposed instruction if counsel could find a case that said the instruction was the correct one and that it should be issued. The State argues, inter alia, that the post-conviction court properly found that counsel's choice of cases to cite was based on adequate and informed research and therefore entitled to deference by the reviewing court. We agree with the State.

The record establishes that the petitioner was represented both at trial and on appeal by experienced defense attorneys who engaged in extensive preparation for the case, which included thorough research on the proximate cause issue. Both junior and senior trial counsel testified that junior trial counsel thoroughly researched the issue, and that they both consulted extensively with appellate counsel on the topic. Despite their research, they were unable to find any reported criminal cases that were on point and, therefore, were forced to rely on civil cases for their argument. Appellate counsel was also unable to find any reported criminal law cases in support of his position, and believed that the four reported cases cited by post-conviction counsel that addressed intervening and superceding causes in homicide cases were too general to be helpful on the specific issue in their case. He explained his reasoning:

So my task on appeal was to try to convince the Court that in fact proximate cause was the test and was the meaning behind the statute involved. And actually, there were no cases in Tennessee that addressed that specific issue in a Vehicular

37

Homicide context, at least not since the enactment
of the statute in the 1989 Criminal Code that
addressed that particular concept.

So . . . my number one battle was not whether
intervening and superseding causes were a concept
of the law applicable to proximate cause but
whether or not proximate cause was applicable to
Vehicular Homicide in the context of the Vehicular
Homicide statute. So there was no case on that.
Actually, the only case on that was against me, an
unreported case of the Court of Criminal Appeals.
So I found some descending [sic] opinions in some
courts and some other arguments to make on behalf
of the concept that proximate cause was the true
test. But as far as explaining what—if proximate
cause was the true test, if I had proven point A,
point B the concept of superseding and intervening
causes, I cited civil cases . . . for that concept.

In addition to failing to show any deficiency on
counsel's part for failing to cite reported criminal law
opinions in support of the proposed jury instruction, the
petitioner has also failed to show that counsel's alleged
deficiency in this respect prejudiced his case. None of
the four cases cited by post-conviction counsel addresses
the issue of proximate cause versus proximate result in
an aggravated vehicular homicide case; thus, they would
not have satisfied the trial court's request for an
opinion that specifically supported counsel's proposed
jury instruction in the context of their case. We further
note this court's observation that the petitioner's brief
failed to contain an opinion from this court "on this
specific issue" was made only after we had applied the
reasoning of State v. Bobby Weaver, No.
02C01-9307-CC-00143, 1995 WL 568420 (Tenn. Crim. App.
Sept. 27, 1995), and concluded that the jury instruction
issued by the trial court "sufficiently informed the jury
of the definition of proximate result as it relates to
vehicular homicide," including "the effect of the
existence of an independent, intervening cause." Donald
W. Branch, 2002 WL 1558485, at *16 (emphasis added).

Branch v. State, 2004 WL 2996894, at *3-*4, *6-*7 (alterations and

emphasis in original).

38

Although the "Brief" cites the legal standards for
reviewing a habeas claim on the merits, "Brief" at 11; see also
supra pp. 25-30, the petitioner does not advance any argument why
the decision of the Tennessee Court of Criminal Appeals on this
issue was contrary to, or an unreasonable application of, clearly
established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-
the-mill state-court decision applying the correct legal rule from
[Strickland v. Washington] to the facts of a prisoner's case" and,
therefore, it "does not fit comfortably within § 2254(d)(1)'s
'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.

It is not clear whether Branch contends that the decision
of the Tennessee Court of Criminal Appeals was an unreasonable
application of Strickland. Although it can be inferred that Branch
disagrees with the state-court decision, he makes no attempt to
analyze the state-court's reasoning in light of Strickland.
Moreover, Branch makes no effort to demonstrate that the state-
court decision is objectively unreasonable, rather than merely
incorrect. Williams, 529 U.S. at 410; see also supra p. 27 n.7. In
this case, the Tennessee Court of Criminal Appeals stated
explicitly that the comment in the direct appeal opinion about the
citation of civil cases "was made only after we had . . . concluded
that the jury instruction issued by the trial court 'sufficiently
informed the jury of the definition of proximate result as it
relates to vehicular homicide,' including 'the effect of the

39

existence of an independent, intervening cause.'" <u>Branch v. State</u>, 2004 WL 2996894, at *7. In light of this explicit language from the court that criticized the citation of civil cases, it is telling that Branch has advanced no argument that the holding of the state court on the issue of prejudice is objectively unreasonable.

In his "Brief," Branch does not address whether the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing. 28 U.S.C. § 2254(d)(2). Even if his argument can be construed as relying on that provision, the petitioner fails to demonstrate that the factual findings of the Tennessee Court of Criminal Appeals were objectively unreasonable. Again, the state court concluded, interpreting a statement it had made in the opinion on direct appeal, that the performance of counsel was not deficient and that Branch had not been prejudiced by the citation of civil cases. Branch also fails to identify any criminal cases counsel should have cited on this issue on direct appeal. Accordingly, Branch has not satisfied his burden of demonstrating, by clear and convincing evidence, that the state-court's decision that he had failed to establish deficient performance and prejudice, within the meaning of <u>Strickland</u>, was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing.

For all of the foregoing reasons, this aspect of Branch's ineffective assistance claim, which is based on the failure to cite reported criminal law cases, is without merit and is DISMISSED.

Branch also exhausted an ineffective assistance claim based on the failure of appellate counsel to supplement his brief with State v. Farner, 66 S.W.3d 188 (Tenn. 2001), which was filed approximately three weeks before the issuance of the decision of the Tennessee Court of Criminal Appeals on direct appeal. Appellate counsel testified at the postconviction hearing that "he assumed 'the Court of Criminal Appeals actually read the Supreme Court opinions as they come out.' Furthermore, although he found the case relevant in its definition of intervening and superceding causes, he did not think it was 'on all fours with regard to whether Vehicular Homicide required proximate causation.'" Branch v. State, 2004 WL 2996894, at *3. In rejecting this claim on the merits, the Tennessee Court of Criminal Appeals stated as follows:

> Although he acknowledges that the Farner court approved the same instruction on causation that the trial court issued in the instant case, he asserts that the case was "vital" because of its "thorough discussion of proximate causation," and argues that counsel was ineffective for failing to cite it for the proposition that causation is an essential element to every homicide.
>
> As with the previous allegation, the post-conviction court attributed appellate counsel's decision not to supplement his brief with the Farner case as one of strategy, subject to deference by the reviewing court. Again, the record supports the findings and conclusions of the post-conviction court. Appellate counsel's testimony at the evidentiary hearing established that he thoroughly researched and analyzed the proximate cause

        issue, read the <u>Farner</u> case when it was released, and
        determined from his experience that, although relevant in
        its definition of superceding and intervening causes, it
        was not "on all fours" with the issue in his case.
        Notwithstanding post-conviction counsel's assertion to
        the contrary, there is nothing in the record to indicate
        that appellate counsel incorrectly read the <u>Farner</u> case
        or misunderstood its holding.[16]

<u>Branch v. State</u>, 2004 WL 2996894, at *7-*8.

        Once again, Branch does not advance any argument why the

decision of the Tennessee Court of Criminal Appeals on this issue

was contrary to, or an unreasonable application of, clearly

established federal law. 28 U.S.C. § 2254(d)(1). Branch also does

not address whether the decision of the Tennessee Court of Criminal

Appeals was based on an unreasonable determination of the facts in

light of the evidence presented at the state-court hearing. 28

U.S.C. § 2254(d)(2). Even if his argument can be construed as

relying on that provision, the petitioner fails to demonstrate that

the factual findings of the Tennessee Court of Criminal Appeals

_____

        [16]    The Tennessee Court of Criminal Appeals explained the substance of
the <u>Farner</u> decision in a footnote, as follows:

                The issue in <u>Farner</u> was "whether Tennessee law recognizes a
        co-perpetrator rule which bars the defendant's convictions for
        criminally negligent homicide on the basis that the victims were
        co-participants in the drag race." 66 S.W.3d at 191. The court
        concluded that there was no such co-perpetrator rule in Tennessee,
        but reversed the convictions and remanded for a new trial due to the
        trial court's failure to issue an instruction on proximate cause in
        connection with the instructions on criminally negligent homicide,
        noting that the trial court provided the jury with an instruction on
        proximate result in conjunction with the instructions on vehicular
        homicide, but that "no similar instructions were given as to
        criminally negligent homicide, nor was the jury referred to the
        instructions on proximate result previously given." [66 S.W.3d] at
        204 n. 14.

<u>Branch</u>, 2004 WL 2996894, at *8 n.4.

were objectively unreasonable. Branch makes no argument that
appellate counsel misunderstood the holding in <u>Farner</u> or that he
was incorrect in his assumption that the members of the Tennessee
Court of Criminal Appeals read the newly released opinions of the
Tennessee Supreme Court.

For all of the foregoing reasons, this aspect of Branch's
ineffective assistance claim, which is based on the failure of
appellate counsel to file a supplemental brief with the Tennessee
Court of Criminal Appeals that cited the Tennessee Supreme Court's
decision in <u>Farner</u>, is without merit and is DISMISSED.

Finally, Branch exhausted an ineffective assistance claim
based on the failure of appellate counsel to argue on direct appeal
that the trial judge should have recused himself. Appellate counsel
testified at the postconviction hearing that "[h]is decision not to
raise the recusal issue was one of strategy, based on his belief
that it did not have any real merit." <u>Branch v. State</u>, 2004 WL
2996894, at *3. In rejecting this claim on the merits, the
Tennessee Court of Criminal Appeals stated as follows:

> The petitioner also contends that appellate counsel
> was ineffective for failing to raise the trial judge's
> refusal to recuse himself as an issue on direct appeal.
> Trial counsel originally filed a motion for recusal based
> on the trial judge's comments at the petitioner's bond
> hearing. These comments occurred as defense counsel was
> arguing for a reduction in the petitioner's bond and
> reminded the trial judge that the petitioner was
> "presumed innocent" of the charges. The trial judge
> responded by stating that the defendant was presumed
> innocent at trial, but he was under no obligation to
> presume the defendant innocent when considering his

request for a reduction in bond. At a later point in the hearing, the trial judge also stated that if it were his job to analyze the petitioner's character at that point, he would say that he was an "out-of-control drunk who cares nothing about the law or other people around him."

The petitioner argues that the trial judge's statements "would cause the trial court's impartiality to be questioned under an objective standard" and that appellate counsel should have pursued the issue on appeal. However, "[t]he determination of which issues to present on appeal is a matter of counsel's discretion." State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984). At the evidentiary hearing, appellate counsel fully and adequately explained his reasons for not raising the recusal issue:

> Well, at the time I looked at that issue and I researched it, looked at the odds of reversal and the law applicable thereto, and didn't really find it to have any merit. I did not think I could succeed in the Appellate Court with claiming that the Judge should have recused himself. So I didn't raise that on appeal.

Appellate counsel's decision not to raise the issue of recusal was obviously the result of extensive experience, preparation, and research. In summary, we conclude that the petitioner has failed to meet his burden of demonstrating he was denied the effective assistance of counsel, either at trial or on appeal.

Branch v. State, 2004 WL 2996894, at *8.

As with his previous ineffective assistance issues, Branch does not advance any argument why the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Branch also does not address whether the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence

presented at the state-court hearing. 28 U.S.C. § 2254(d)(2). Even if his argument can be construed as relying on that provision, the petitioner fails to demonstrate that the factual findings of the Tennessee Court of Criminal Appeals were objectively unreasonable. Branch makes no argument that the recusal issue was legally meritorious under Tennessee law. In that regard, it is noteworthy that the trial judge's statement was not made in the presence of the jury and was based solely on information he received in his judicial capacity.

The ineffective assistance claim based on the failure of appellate counsel to raise the recusal issue is DISMISSED.

B.   Judicial bias (Claim 2)

In his second claim for relief, Branch asserts that the trial judge was so biased and prejudiced toward him that he was denied his constitutional rights to a fair trial and, therefore, the trial judge should have recused himself. The factual basis for this claim is not described at length in the petition, but it can be assumed that Branch is referring to the comments of the trial judge at the bond hearing.

Branch did not raise this issue on direct appeal, and he also did not raise it in his postconviction petition apart from the claim that appellate counsel was ineffective for failing to raise the issue on direct appeal. Accordingly, this claim is barred by procedural default. Moreover, in light of the previous holding that

45

appellate counsel did not render ineffective assistance by failing to raise this issue on direct appeal, Branch cannot establish cause for his default.

Accordingly, Claim 2 is DISMISSED.

C.   The allegedly defective indictments (Claim 3)

In his third claim for relief, Branch asserts that the indictment and/or indictments were void because they failed to allege the requisite mental state of "knowingly" as required by Tenn. Code Ann. § 39-17-417(c). Branch raised this issue, both as a violation of Tennessee law and of the federal Constitution, in his pro se postconviction petition, which was filed on July 19, 2002.[17] The issue was not raised in Branch's brief to the Tennessee Court of Criminal Appeals in connection with his postconviction petition, however, so the claim is barred by procedural default.[18]

The Court DISMISSES Claim 3.

D.   Sentencing issues (Claims 4-6)

Next, Branch argues that his sentence was imposed in violation of the Sixth and Fourteenth Amendments of the United States Constitution and, in particular, that his sentence is inconsistent with the Supreme Court's decision in Blakely v.

---

[17]   A partial copy of that petition is attached as Exhibit 1 to Branch's § 2254 petition. The relevant argument appears at pp. 13-14.

[18]   A copy of the brief to the Tennessee Court of Criminal Appeals is attached as Exhibit 3 to Branch's § 2254 petition.

Washington, 124 S. Ct. 2531 (2004). The Tennessee Court of Criminal

Appeals rejected this claim on the merits:

> The petitioner contends that Blakely v. Washington,
> 542 U.S. ----, 124 S. Ct. 2531 (2004), in which the
> United States Supreme Court, applying the rule in
> Apprendi v. New Jersey, 530 U.S. 466 . . . (2000), held
> that the Sixth Amendment prohibits a defendant's sentence
> from being increased beyond the presumptive statutory
> maximum based on facts which have neither been found by
> a jury nor admitted by the defendant, applies
> retroactively to invalidate the enhanced and consecutive
> sentences imposed in his case. Noting that a panel of
> this court recently concluded that "Blakely . . .
> establishes a new rule in this state," State v. Chester
> Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2246196
> (Tenn. Crim. App. Oct. 4, 2004),[19] the petitioner
> argues that, under the test announced in Teague v. Lane,
> 489 U.S. 288 . . . (1989), Blakely is a new "watershed
> rule of criminal procedure," requiring retroactive
> application. We respectfully disagree.
>
> Under Teague, an exception to the general rule
> against the retroactivity of new procedural rules applies
> in cases which involve "watershed rules of criminal
> procedure," or "those new procedures without which the
> likelihood of an accurate conviction is seriously
> diminished." 489 U.S. at 311-13 . . . (Brennan, J.,
> dissenting) (citing Mackey v. United States, 401 U.S.
> 667, 692 . . . (1971)). The Teague Court, recognizing
> that the exception was a narrow one, wrote:
>
> > Because we operate from the premise that such
> > procedures would be so central to an accurate
> > determination of innocence or guilt, we believe it
> > unlikely that many such components of basic due
> > process have yet to emerge. We are also of the view
> > that such rules are "best illustrated by recalling
> > the classic grounds [for] the issuance of a writ of
> > habeas corpus—that the proceeding was dominated by
> > mob violence; that the prosecutor knowingly made
> > use of perjured testimony; or that the conviction

---

[19]    The Tennessee Court of Criminal Appeals noted in a footnote that
"[t]his opinion has been withdrawn and superseded by State v. Chester Wayne
Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034 (Tenn. Crim. App. Nov. 30,
2004)." Branch v. State, 2004 WL 2996894, at *9 n.5.

was based on a confession extorted from the
defendant by brutal methods."

Id., 489 U.S. at 313 . . . (quoting Rose v. Lundy, 455
U.S. 509, 544, . . . (1982) (Stevens, J., dissenting)).

The United States Supreme Court has not yet
specifically addressed the retroactive application of
Blakely. However, in Schriro v. Summerlin, --- U.S. ----,
124 S. Ct. 2519, 2526 . . . (2004), the Court held that
Ring v. Arizona, 536 U.S. 584 . . . (2002), which applied
the rule in Apprendi to require that a jury, rather than
a trial judge, find the existence of aggravators
necessary to impose the death penalty, was not a
watershed rule of criminal procedure and therefore did
not apply retroactively to cases already final on direct
review. Noting that "for every argument why juries are
more accurate factfinders [than judges], there is another
why they are less accurate," the Court concluded that the
evidence was simply "too equivocal" to support the
conclusion that a trial judge's, rather than a jury's,
finding of death penalty aggravators seriously diminished
the accuracy of the proceeding. Schriro, --- U.S. at
----, 124 S. Ct. at 2525.

Other jurisdictions which have addressed the issue
have declined to apply Blakely retroactively to cases
that are final on direct appeal. See In re Dean, 375 F.3d
1287, 1290 (11th Cir. 2004) ("Because Blakely, like Ring,
is based on an extension of Apprendi, Dean cannot show
that the Supreme Court has made that decision retroactive
to cases already final on direct review."); McBride v.
State, 884 So. 2d 476, 478 (Fla. Dist. Ct. App. 2004)
("We further hold that Blakely does not apply
retroactively to cases on collateral review."); State v.
Petschl, 688 N.W.2d 866, 2004 WL 2663594, at *7 (Minn.
Ct. App. 2004) ("Blakely has the same procedural effect
as Apprendi, increasing the accuracy of the sentence but
not the conviction. Because the Blakely rule does not
improve the accuracy or fairness of a trial, we conclude
that it is not a watershed rule subject to retroactive
application on collateral review.").

The petitioner, while acknowledging the holding in
Schriro, argues that Blakely should apply retroactively
to his case because unlike in Schriro, where the Arizona
trial judge was already required to find the existence of
aggravating factors beyond a reasonable doubt, his trial

48

> judge was permitted to find the existence of the factors
> used to enhance his sentence by a preponderance of the
> evidence. However, even with the different standards
> applied, we are still unable to conclude that the judge's
> finding of enhancement factors "seriously diminishe[d]
> accuracy." Schriro, --- U.S. at ----, 124 S. Ct. at 2525.
> Therefore, like other jurisdictions, we decline to find
> Blakely retroactively applicable to cases on collateral
> appeal.

Branch v. State, 2004 WL 2996894, at *9-*10.

Although Branch has submitted a copy of the supplemental brief he submitted to the Tennessee Court of Criminal Appeals on the Blakely issue,[20] he does not present any argument why the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-the-mill state-court decision applying the correct legal rule from [Schriro and Teague v. Lane, 489 U.S. 2888 (1989),] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.

It is not clear whether Branch contends that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Schriro and Teague. Although it can be inferred that Branch disagrees with the state-court decision, he makes no attempt to analyze the state-court's reasoning in light of those Supreme

---

[20]     A copy of the motion and brief are attached to the § 2254 petition as Exhibits 4 and 5.

Court precedents.[21] Moreover, Branch makes no effort to demonstrate that the state-court decision is objectively unreasonable, rather than merely incorrect. Williams, 529 U.S. at 410; see also supra p. 27 n.7. In that regard, the Sixth Circuit, relying on Schiro and Teague, has held that federal prisoners may not raise claims based on Blakely and United States v. Booker, 125 S. Ct. 738 (2005), in an initial motion pursuant to 28 U.S.C. § 2255. Humphress v. United States, 398 F.3d 855, 860-63 (6th Cir. 2005).

Claims 4-6 are, therefore, DISMISSED.

E.    Sufficiency of the evidence (Claim 7)

In his seventh claim for relief, Branch contends that the evidence with regard to vehicular homicide and aggravated vehicular homicide is insufficient to support the verdicts beyond a reasonable doubt. Branch raised this issue on direct appeal, and the Tennessee Court of Criminal Appeals, after conducting an exhaustive analysis, rejected it on the merits:

> Defendant contends that the evidence adduced at trial was insufficient to sustain his convictions for aggravated vehicular homicide or vehicular homicide. Specifically, Defendant argues that the State failed to prove beyond a reasonable doubt that his blood alcohol content was the requisite level of 0.20 or that the killing of the victims was the proximate result of either Defendant's intoxication or recklessness. We disagree.

---

[21]    Although Branch argued in state court that Tennessee should not be bound by the Teague test, Pet., Ex. 5, at 12-23, the failure of the Tennessee state courts to adopt this argument is not cognizable in a petition pursuant to 28 U.S.C. § 2254, which authorizes a federal court to issue a writ of habeas corpus with respect to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In assessing whether Branch is in custody in violation of the United States Constitution, this Court is required to apply Teague.

When evidentiary sufficiency is questioned on appeal, the standard of review is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318-319 . . . (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). Instead, on appeal the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. Hall, 8 S.W.3d at 599. A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory, effectively removing the presumption of innocence and replacing it with a presumption of guilt. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters to be resolved by the trier of fact, not this Court. Id. The defendant bears the burden of demonstrating that the evidence is insufficient to support his or her conviction. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, "aggravated vehicular homicide" is vehicular homicide, as defined in § 39-13-213(a)(2), where there was at the time of the offense twenty-hundredths of one percent (.20%), or more, by weight of alcohol in the defendant's blood and the defendant had one prior conviction for driving under the influence of an intoxicant. See Tenn. Code Ann. § 39-13-218(a)(3) (1997). Aggravated vehicular homicide is a Class A felony. Tennessee Code Annotated section 39-13-213(a)(2) defines "vehicular homicide" as "[t]he reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle: (1)[a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or (2)[a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Vehicular homicide is a Class C felony unless it is the proximate

result of driver intoxication, in which case the offense is elevated to a Class B felony. See Tenn. Code Ann. § 39-13-213(b) (1997).

A.   Blood Alcohol Test

Because Defendant refused Officer Woods' request for a blood alcohol test, the sole evidence of Defendant's blood alcohol content was based on the result of a blood test conducted by the staff at the Regional Medical Center for purposes of Defendant's medical treatment. At trial, this evidence was admitted during testimony from the medical lab technician who performed the test. Defendant contends that this evidence cannot be relied upon to prove his guilt beyond a reasonable doubt because the technician was not qualified to testify as an expert witness. Defendant also argues that because the instrument used at the Medical Center was designed to test the levels of alcohol in blood serum, as opposed to whole blood, the serum levels reported by this instrument did not constitute evidence from which the jury could properly infer a valid whole blood test result.

In effect, Defendant's argument challenges the reliability and admissibility of the blood alcohol test evidence. We shall therefore address these two issues. According to the record, Defendant properly raised the issue of admissibility in a pre-trial motion to suppress and also objected at trial prior to the testimony of the medical lab technician who reported the result to the jury. For the reasons following, we find that the "reliability," or proper weight to be given this evidence, is a matter for the jury to determine, not this Court, and that the trial court did not err when it found Defendant's blood test results admissible.

With regard to reliability, the State presented testimony from Dowana Moore, the medical lab technician who conducted the blood alcohol test, to show that the level of alcohol in Defendant's blood was 0.22. (Proof of the level of alcohol in Defendant's blood was presented in the first phase of trial and was also used during the second phase to prove that Defendant's blood alcohol content was more than 0.20, one element of aggravated vehicular homicide.) The State also provided testimony from the manager of the medical records for the Regional Medical Center and the lab supervisor, during which both witnesses identified the medical report in issue as one

52

prepared by the Medical Center and belonging to
Defendant. In addition, the jury heard testimony from the
Associate Director of the Trauma Unit in charge of
Defendant's medical care, the medical lab assistant who
logged Defendant's blood sample into the facility's
computer, and an expert in the operation of the
instrument used by the Medical Center to analyze blood
serum. Although the evidence indicated that blood serum
levels of alcohol are typically higher than for that of
whole blood, Dr. Stafford testified that the number
entered on the medical chart reveals the grams of alcohol
per one hundred milliliters of whole blood and the level
of mathematical expertise required to make the conversion
is minimal. See State v. Braden, 867 S.W.2d 750, 757
(Tenn. Crim. App. 1993) (fact that the initial
determination of the lab technician was based on the
alcohol present in the accused's blood serum, as opposed
to whole blood, went to the weight of the evidence).

In his brief, Defendant argues that inferring an
actual whole blood level in excess of .20% in Defendant's
blood from the above evidence "amounts to speculation,
surmise, and conjecture" on the part of the jury.
However, the proper weight to give any witness' testimony
turns largely on his or her credibility, and questions
concerning the credibility of witnesses, the weight and
value of evidence, and factual issues raised by the
evidence are matters properly reserved exclusively for
the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn.
1997). We may presume that the jury observed the
witnesses at trial and evaluated their credibility
accordingly. This Court will not reweigh evidence or
substitute our inferences for those drawn by the triers
of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.
1978). Defendant is not entitled to relief on this issue.

Concerning the admissibility of Defendant's blood
test result, we first observe that, according to statute,
anyone who operates a motor vehicle on the roads of
Tennessee is "deemed to have given consent to a test for
the purpose of determining the alcoholic or drug content
of that person's blood . . . ." Tenn. Code Ann. §
55-10-406(a)(1) (1997 & Supp. 2000). Notwithstanding this
implied consent, a person charged with driving under the
influence may refuse to submit to testing, and the tests
shall not be given. See id. § 55-10-406(a)(3). An
exception to this rule exists when a person is charged
with aggravated assault or vehicular homicide. In that

case, Tennessee Code Annotated section 55-10-406(e) provides that "[n]othing in this section shall affect the admissibility in evidence in criminal prosecutions for aggravated assault or homicide by the use of a motor vehicle only, of any chemical analysis of the alcoholic or drug content of the defendant's blood which has been obtained by any means lawful," even when the defendant did not consent to having his blood withdrawn. See State v. Jordan, 7 S.W.3d 92, 98-99 (Tenn. Crim. App. 1999) (reiterating the four prerequisites that must be satisfied before the results of a compelled blood alcohol test are admissible); State v. Huskins, 989 S.W.2d 735, 738 (Tenn. Crim. App. 1998) (interpreting subsection 55-10-406(e) "as addressing the admissibility of otherwise lawfully obtained test results where the sample was not voluntarily taken, i.e., when the defendant refuses to submit voluntarily to testing or when the defendant is unconscious or otherwise incapable of rendering consent at the time the sample is drawn").

We are mindful that Defendant's blood was not drawn at the request of law enforcement personnel, but in accordance with procedures deemed medically necessary at the time. In State v. Ridge, 667 S.W.2d 502, 505 (Tenn. Crim. App. 1982), this Court held that Tennessee Code Annotated section 55-10-406 applies to tests conducted at the requests of law enforcement officers, rather than medical personnel. However, Ridge also clearly held that blood drawn pursuant to a medical request and analyzed for blood alcohol content may be properly admitted into evidence. Id. Moreover, in State v. Goldston, 29 S.W.3d 537 (Tenn. Crim. App. 1999), we determined that records concerning blood test results performed after the defendant's motor vehicle accident were properly admitted in a DUI prosecution under the business records exception to the hearsay rule, where the records were medical reports compiled by medical personnel, the hospital's practice was to regularly compile such reports, the defendant's blood tests were performed in the course of regularly conducted hospital activities, and each report was prepared near the time of testing and admitted through testimony of the proper records custodian. Id. at 540. Although the defendant in Goldston was charged with DUI, rather than vehicular homicide, the rationale equally applies here.

In Defendant's case, we are satisfied that the medical records were properly admitted under the business

54

records exception to the hearsay rule. The testimony of the manager ("custodian") of the medical records for the Regional Medical Center identified the medical report in issue as part of the medical reports compiled by medical personnel with knowledge. In addition, the medical personnel who compiled the reports were under a business duty to record the blood testing procedures and the results of the tests. Further, the evidence showed that Defendant's blood tests were conducted in the course of regularly conducted hospital activities and that the results were recorded at or near the time of the testing. Consistent with Goldston, we find that hospital records kept daily for medical purposes and not prepared for the purpose of litigation are sufficiently reliable for purposes of admissibility. See id. at 542. Since the blood test results were properly admitted under the business records exception to hearsay, whether or not the technician was an "expert" does not matter. Defendant is not entitled to relief on this issue.

B.    Proximate Result

Defendant also contends that the State failed to prove beyond a reasonable doubt that the killing of the victims was the proximate result of either recklessness or intoxication on the part of Defendant.

Before ascertaining that the killing was a proximate result of either conduct or intoxication, the jury was required to determine that a reckless killing occurred. "Vehicular homicide" is defined, in relevant part, as "the reckless killing of another by the operation of an automobile, airplane, motorboat, or other motor vehicle: (1)[a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or (2)[a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213 (1997). For purposes of applying the statute, "reckless" refers to a person who

acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person

would exercise under all the circumstances as
viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106 (1997).

The record reveals that, immediately prior to
hitting the victims' vehicle, Defendant was observed
traveling at speeds estimated at 80 to 100 miles per hour
by at least five other motorists and a driver who was
waiting at the intersection alongside the victims. These
witnesses testified that Defendant frightened motorists,
passed vehicles using lanes not legal to drive in,
sprayed gravel on them, came too close to their vehicles,
and appeared generally out of control, dangerously
weaving in and out of traffic. The accident
reconstructionist not only confirmed that Defendant was
speeding but, more significantly, also showed that it was
unlikely Defendant even reduced his speed prior to
colliding with the victims' vehicle. Lastly, Defendant
admitted at trial that he was aware the intersection
wherein he killed the victims was dangerous. Based on the
forgoing, we conclude that the evidence was sufficient
for the jury to find that Defendant acted recklessly. The
testimony of the other drivers on the highway with
Defendant prior to the accident proved beyond a
reasonable doubt that Defendant consciously disregarded
a substantial and unjustifiable risk that someone may be
injured or killed if he did not exercise sufficient care.
This disregard constituted a gross deviation from the
standard of care that an ordinary person would exercise
under the circumstances presented.

Defendant asserts that Stephanie Kuehl was negligent
when she drove onto the highway in front of Defendant on
May 30, 1997 and points to the testimony of Richard
Leggett and Daniel Evans as proof. To briefly review,
Leggett testified that Stephanie failed to come to a
complete stop at the stop sign before entering highway
traffic, and Evans testified that a prudent person would
not have driven onto the road under the circumstances.
Defendant contends that Stephanie's conduct constituted
an "intervening superceding" cause which removes his
responsibility for any reckless conduct, but cites no
legal authority for this contention. Consequently, we
find no merit in this argument. Moreover, Defendant
testified that he observed Stephanie stop at the stop
sign, contradicting Leggett's statement.

56

The jury further determined that the killings were the proximate result of Defendant's intoxication. According to the record, the proof of Defendant's intoxication was overwhelming. Dr. Stafford's testimony, which showed the alarming effects of alcohol intoxication on a person's mental acuity, response time, muscular control, and chances of having a multi-vehicle accident, indicates that Defendant's conduct was probably due, at least in part, to intoxication. Accordingly, we find the evidence was sufficient for a jury to find that the reckless killings were the "proximate result" of Defendant's intoxication.

Since the evidence was sufficient for a rational jury to conclude that the killing was reckless and the proximate result of Defendant's intoxication, he is not entitled to relief on this issue.

State v. Branch, 2002 WL 1558485, at *11-*15.

Branch does not explain why the decision of the Tennessee Court of Criminal Appeals on this issue was contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). This is "a run-of-the-mill state-court decision applying the correct legal rule from [Jackson v. Virginia, 443 U.S. 307, 324 (1979),] to the facts of a prisoner's case" and, therefore, it "does not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams v. Taylor, 529 U.S. at 406.[22]

---

[22] In Jackson v. Virginia, 443 U.S. 307, 324 (1979), the Supreme Court held that

in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt.

This standard requires a federal district court to examine the evidence in the light most favorable to the State. Id. at 324, 326 ("a federal habeas corpus court faced with a record of conflicting facts that supports conflicting (continued...)

It is not clear whether Branch contends that the decision of the Tennessee Court of Criminal Appeals was an unreasonable application of Jackson v. Virginia. Although it can be inferred that Branch disagrees with the state-court decision, he has not submitted a brief analyzing the particular deficiencies in the state-court decision in light of Jackson. Moreover, Branch makes no effort to demonstrate that the state-court decision is objectively unreasonable, rather than merely incorrect. Williams, 529 U.S. at 410; see also supra p. 27 n.7. A reference to the brief filed in the Tennessee Court of Criminal Appeals, and the submission of a copy of that brief, does not constitute an argument that the decision constitutes an unreasonable application of Jackson. Moreover, the Tennessee Court of Criminal Appeals cited the correct legal standard, see supra p. 51, and then applied that standard to the arguments raised by Branch about the sufficiency of the evidence, see supra pp. 52-57.

Branch also does not address whether the decision of the Tennessee Court of Criminal Appeals was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing. 28 U.S.C. § 2254(d)(2). Because he has submitted no brief addressing the decision of the Tennessee Court

---

[22]     (...continued)
inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). Applying those standards, the Supreme Court rejected the petitioner's claim that there was insufficient evidence in the record to permit a trier of fact to conclude, beyond a reasonable doubt, that he was guilty of premeditated first-degree murder. See id. at 324-26.

of Criminal Appeals, it necessarily follows that Branch has not satisfied his burden of demonstrating, by clear and convincing evidence, that the state-court's decision that sufficient evidence existed to support his convictions for vehicular homicide and aggravated vehicular homicide was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing.

Accordingly, Claim 7 is without merit and is DISMISSED.

F.   The allegedly deficient jury instructions (Claim 8)

In his eighth claim for relief, Branch contends that the instructions given to the jury on "proximate results" were insufficient to allow the jury to determine if his conduct or intoxication was the proximate cause of the deaths. Branch raised this issue on direct appeal, and the Tennessee Court of Criminal Appeals rejected it on the merits. State v. Branch, 2002 WL 1558485, at *15-*16. It appears, therefore, that Branch has exhausted this issue in state court.

As a threshold issue, it does not appear that this claim is cognizable in a petition pursuant to 28 U.S.C. § 2254. As previously noted, see supra pp. 30 n.10, 50 n.21, this Court is authorized to issue a writ of habeas corpus with respect to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Error in the application of state law is not

59

cognizable in a federal habeas proceeding. <u>Estelle v. McGuire</u>, 502
U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas
court to reexamine state-court determinations on state-law
questions"); <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984). Branch did
not brief this issue in his § 2254 petition but, instead, referred
only to his state-court brief. An examination of the brief filed by
Branch with the Tennessee Court of Criminal Appeals on direct
appeal indicates that the issue was presented solely as a violation
of state law.[23] Moreover, the treatment of this issue by the
Tennessee Court of Criminal Appeals considers only the application
of state evidentiary rules.

     As federal habeas relief is not available with respect to
this issue, the Court DISMISSES Claim 8.

     G.   <u>The admission of the blood test results (Claim 9)</u>

     In his ninth claim for relief, Branch argues that the
trial judge erred in allowing the blood test results into evidence
as the State failed to establish the "chain of custody" of the
blood sample that was tested or otherwise establish the identity
and integrity of the sample. Branch raised this issue on direct
appeal, Pet, Ex. 7, at 20-21, and the Tennessee Court of Criminal
Appeals rejected it on the merits, <u>State v. Branch</u>, 2002 WL
1558485, at *17-*18. It appears, therefore, that Branch has
exhausted this issue in state court.

---

    [23]    A copy of the direct appeal brief is attached to the § 2254 petition
as Exhibit 7.

Just as with the previous issue, this claim is not cognizable in a § 2254 petition. Branch did not brief this issue in his § 2254 petition but, instead, referred only to his state-court brief. The brief filed by Branch with the Tennessee Court of Criminal Appeals on direct appeal presented the issue solely as a violation of state law. Moreover, the treatment of this issue by the Tennessee Court of Criminal Appeals considers only the application of state evidentiary rules. As federal habeas relief is not available on this issue, Claim 9 is DISMISSED.

H.   The refusal to permit the defense to rebut the State's closing argument (Claim 10)

In his tenth claim for relief, Branch argues that the trial judge erred in refusing to allow the defense an opportunity to rebut the final closing argument of the prosecution when the State made only a perfunctory opening argument. Branch raised this issue on direct appeal, Pet, Ex. 7, at 22-23, and the Tennessee Court of Criminal Appeals rejected it on the merits, State v. Branch, 2002 WL 1558485, at *18-*19. It appears, therefore, that Branch has exhausted this issue in state court. Once again, however, Branch raised this issue solely as a matter of state law, so the issue is not cognizable in a § 2254 petition.

As federal habeas relief is not available on this issue, Claim 10 is DISMISSED.

I.   Additional sentencing issues (Claims 11-12)

In his eleventh claim for relief, Branch asserts that the sentence imposed by the trial judge was excessive because the trial judge misapplied the enhancement factors. In his twelfth claim for relief, Branch contends that the trial judge erred in ordering consecutive sentencing as the trial court misapplied the applicable criteria required by State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). Branch raised both these issues on direct appeal, Pet., Ex. 7, at 24-26, and the Tennessee Court of Criminal Appeals rejected them on the merits, State v. Branch, 2002 WL 1558485, at *19-*24. Because these issues concern the application of Tennessee statutory law, and state-court decisions applying that law, the issue is not cognizable in a § 2254 petition. Therefore, the Court DISMISSES Claims 11 and 12.

Because it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court," summary dismissal prior to service on the respondent is proper. Rule 4, Section 2254 Rules. The petition is DISMISSED.

V.   APPEAL ISSUES

The Court must also determine whether to issue a certificate of appealability ("COA"). The statute provides:

(1)   Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)   the final order in a habeas corpus proceeding
      in which the detention complained of arises
      out of process issued by a State court; or

(B)   the final order in a proceeding under section
      2255.

(2)   A certificate of appealability may issue under
      paragraph (1) only if the applicant has made a
      substantial showing of the denial of a
      constitutional right.

(3)   The certificate of appealability under paragraph
      (1) shall indicate which specific issue or issues
      satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c); <u>see also</u> Fed. R. App. P. 22(b); <u>Lyons v. Ohio</u>

<u>Adult Parole Auth.</u>, 105 F.3d 1063, 1073 (6th Cir. 1997) (district

judges may issue certificates of appealability under the AEDPA). No

§ 2254 petitioner may appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the

Supreme Court stated that § 2253 is a codification of the standard

announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which

requires a showing that "reasonable jurists could debate whether

(or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were

"'adequate to deserve encouragement to proceed further.'" <u>Slack</u>,

529 U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

The Supreme Court recently cautioned against undue

limitations on the issuance of certificates of appealability:

[O]ur opinion in <u>Slack</u> held that a COA does not require
a showing that the appeal will succeed. Accordingly, a
court of appeals should not decline the application of a
COA merely because it believes the applicant will not

demonstrate an entitlement to relief. The holding in
<u>Slack</u> would mean very little if appellate review were
denied because the prisoner did not convince a judge, or,
for that matter, three judges, that he or she would
prevail. It is consistent with § 2253 that a COA will
issue in some instances where there is no certainty of
ultimate relief. After all, when a COA is sought, the
whole premise is that the prisoner "'has already failed
in that endeavor.'"

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>,

463 U.S. at 893). Thus,

> [a] prisoner seeking a COA must prove "'something
> more than the absence of frivolity'" or the existence of
> mere "good faith" on his or her part. . . . We do not
> require petitioners to prove, before the issuance of a
> COA, that some jurists would grant the petition for
> habeas corpus. Indeed, a claim can be debatable even
> though every jurist of reason might agree, after the COA
> has been granted and the case has received full
> consideration, that petitioner will not prevail.

<u>Id.</u> at 338 (quoting <u>Barefoot</u>, 463 U.S. at 893); <u>see also</u> <u>id.</u> at 342

(cautioning courts against conflating their analysis of the merits

with the decision of whether to issue a COA; "The question is the

debatability of the underlying constitutional claim, not the

resolution of that debate.").[24]

In this case, there can be no question that any appeal by

this petitioner on any of the issues raised in this petition does

not deserve attention for the reasons previously stated. The Court,

therefore, DENIES a certificate of appealability.

_____

[24]    By the same token, the Supreme Court also emphasized that "[o]ur
holding should not be misconstrued as directing that a COA always must issue."
<u>Id.</u> at 337. Instead, the COA requirement implements a system of "differential
treatment of those appeals deserving of attention from those that plainly do
not." <u>Id.</u>

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying habeas petitions. <u>Kincade v. Sparkman</u>, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal <u>in forma pauperis</u> in a habeas case, and thereby avoid the $255 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). <u>Kincade</u>, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal <u>in forma pauperis</u>, the prisoner must file his motion to proceed <u>in forma pauperis</u> in the appellate court. <u>See</u> Fed. R. App. P. 24(a)(4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter is not taken in good faith, and leave to appeal <u>in forma pauperis</u> is DENIED. Accordingly, if petitioner files a notice of appeal, he must also pay the full $255 appellate filing fee or file a motion

to proceed in forma pauperis and supporting affidavit in the Sixth
Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this _30th_ day of December, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 5 in case 1:05-CV-01236 was distributed by fax, mail, or direct printing on December 30, 2005 to the parties listed.

---

Donald Branch
Hardeman County Correctional Facility
305293
PO Box 549
Whiteville, TN 38075--054

Honorable J. Breen
US DISTRICT COURT